Case No. 16-4098 Stevens Engrs Constr Inc v. Local 17 Iron Workers Pension et al. Case No. 16-4099 Local 17 Iron Workers Pension v. Stevens Engrs Constr Inc Or arguments not to exceed 15 minutes. Mr. Richard Lewis Stoper for the appellants. It pleases the court. My name is Richard Stoper. I represent the appellants, trustees of the Iron Workers Local 17 Pension Fund. And I'd like to reserve four minutes for rebuttal. Very well. The trustees are here to ask this court to reverse the judgment of the district court and enter judgment in favor of the trustees for the reason that the arbitrator made the erroneous legal conclusion that the trustees lacked jurisdiction or authority to assess withdrawal liability. The case arises from work performed by Stevens at the U.S. Steel Mill in Lorain, Ohio, after Stevens had terminated its collective bargaining agreement with Local 17. The facts found by the trustees and confirmed by the arbitrator established that the work was performed at the mill and met the statutory requirements for withdrawal liability. It was work in the jurisdiction of the collective bargaining agreement of Local 17, and it was work that Stevens had used Local 17 Iron Workers to perform while Stevens was a signatory to this collective bargaining agreement. In their initial assessment of withdrawal liability, the trustees informed Stevens that it was performing the same work at the same plant that it had performed while it was a party to the collective bargaining agreement but was no longer paying contributions because it had withdrawn from the collective bargaining agreement. These facts are undisputed, and the arbitrator found that none of them were wrong. These undisputed facts justify a judgment in favor of the trustees on the ground that all the elements of withdrawal liability are met. The arbitrator found in Article 1B of the collective bargaining agreement that rigging work, the type of work at issue here, was work that belonged to the iron workers. The arbitrator found that Stevens, while a party to the CBA, had performed several jobs assigning iron workers to do rigging work in 1997, 2004, 2007, and 2010, including at the very same steel mill at which they performed the post-termination work in 2013 that's the subject of this case. What about the reality that when the new work was done, there was a protest by the union that it should be done by iron workers and not mill workers, and yet a referee wasn't sought and it was allowed to be done by mill workers? I mean, that seems to me kind of significant here. What the statute asks, the standard that the Congress enacted for the imposition of withdrawal liability asks whether the work was in the jurisdiction of the collective bargaining agreement. And of the type. Or which contributions were previously required. So what happens in the future, the post-termination work can be performed by anyone. It's irrelevant who performs it. It's irrelevant if it's performed by non-union members. It's irrelevant if it's performed by members of another trade. The typical withdrawal liability case is one where the employer has terminated the CBA, has escaped from those obligations, and is a free agent and can assign that work to whoever they like. So the fact that the union, through the NMA, made a protest is irrelevant because whoever got that work is not the test for withdrawal liability. But why aren't I allowed to assume, given that history, that this is work that under mill workers, CBAs, mill workers usually do. And the withdrawal liability is for something iron workers had done. I mean, I read the language to talk about two points. Geography, northern Ohio, and type of work. The type of work being iron work. And I realize there's some overlap, but the reality is no one sought a referee. At the end of the day, this was allowed to be done by mill workers. That seems to me to fail the type of work requirement. You have to have both, not either or for the withdrawal liability, right? I mean, well, tell me why I'm wrong, I guess. Well, because the evidence here shows that this type of work, during the collective bargaining agreement, was assigned to iron workers. It was rigging work, was referred to in the collective bargaining agreement as belonging to iron workers. And on several of these jobs, at these similar types of plants, including this very same plant, what was previously required, Stevens assigned iron workers. I mean, what's unfair to Stevens on this is if you had refereed, if you protested and sought a referee, and the referee had said, well, you know, this really is iron work. Stevens at that point would have had the right to subcontract for it from iron workers who were already paying into the fund. So what seems unfair, and that would have been good, right? Because this is the whole point. We want to make sure people are contributing to the fund and not getting a free ride. What happens to Stevens, though, that seems like a bait and switch, is no one seeks the referee, no one protests. So they have the right to assume they're not incurring this liability. I mean, had they known about this risk, they would have subcontracted. I mean, clearly that was their mode of operation, subcontract out from someone who's already paying into the fund. So that just seems unfair to me. I mean, but tell me why I'm missing it. Stevens was always aware of this risk. The evidence in the record is that they withdrew from the collective bargaining agreement because they were, or they terminated it because they were fearful of withdrawal liability. Right, right. Pretty understandable, given the size of it. And they could, from the very beginning of this job in 2013, could have assigned this worker, subcontracted. But aren't I right? If you had protested, the referee had said this has to be done by ironworkers, they would have, of course, subcontracted out to ironworkers who were already paying into the fund. And there would have been no risk of liability. Well, I or the fund could not have made a protest. Well, no, but whoever the union was. But you get my point, isn't it? I understand, Your Honor. Isn't it true that if that happened, they would have had no risk here? If they had subcontracted to ironworkers, that's true, they would have had no risk. But that was a decision they decided to take a risk and to assign mill rights. After the union chose not to call a referee. The union, Local 17, the, there was no collective bargaining agreement between Local 17 and Stevens. The national maintenance agreement was with the international union. The international union chose not to take any action. But the fund's not bound by that. The fund is not bound by the provisions of the arbitration provision for several reasons. First of all, who the work is ultimately assigned to for purposes of withdrawal liability is irrelevant because that's not the test Congress set. Number two, if Congress had intended for funds to be bound by contractual grievance procedures, Congress would have put that into the withdrawal liability statute. They declined to do so, and this court shouldn't incorporate into the MPPAA a contractual grievance procedure that Congress did not make part of the statute. Further, the purpose of the NMA is only to resolve that particular work assignment. The very provisions of the NMA say no action for damages can be brought on any decision by the umpire under this statute or under this agreement. So it would have been a waste of time for the fund, even if it had the power to do so, which it didn't, it would have been a waste of time for the fund to attempt to invoke those procedures. It would have had a worthless decision. The purpose of the NMA was to have a very streamlined process. The purpose of which... and making sure iron workers do work iron workers are supposed to do. That wouldn't have been worthless. Well, the fund's interests are different than the interests of the union, as the Supreme Court held in Schneider Moving v. Robbins. The union has an obligation to its members, a duty of fair representation. The fund has a fiduciary duty to the pensioners. The union doesn't represent the pensioners. The union, perhaps on this project, decided it just wasn't worth it in the interest of labor peace or in the interest of already having had many iron workers assigned to the project through subcontractors. So the union made its decision based on factors totally apart from what the fund fiduciaries have to determine. The fund trustees have to consider the fact that they have a fiduciary obligation to the pensioners to assess withdrawal liability and to bring this action, and all the elements of the statute have been met. It's only if the focus of the arbitrator and the focus of the district court was on how this work was assigned,  But it is relevant for determining jurisdiction, right? Unless we accept your geography-only argument. It's relevant to how it was assigned in the past. You say how it was assigned in the past, how it was assigned in the past. That can mean two different things. You could say let's look at specifically how it was assigned, and it was assigned to iron workers. Or you could say more generally it was assigned pursuant to an NMA and happened at that time to be assigned to iron workers, but now is being assigned pursuant to the NMA and it's going to the mill workers. So that's exactly the way it was done in the past, right? So it just depends on how specifically you look at what was done in the past. Well, all the evidence in the past is that on these projects, as the arbitrator himself found and as the district court found, that Stevens had assigned iron workers to the NMA. Pursuant to the NMA. Or not conflicting with the NMA, which was incorporated into the agreement, right? Pursuant to the Local 17 Collective Bargaining Agreement. In 2013, after Stevens has terminated the You're not really answering my question. I'm sorry, Your Honor, perhaps I'm not. You're talking about the way it was previously done, right? Right. What was previously required? You could say previously it was done by the iron workers. I understand that. Literally true. But legally you could say previously it was done pursuant to a contract which sometimes assigned it to iron workers and sometimes assigned it to mill workers. And now it's being assigned, just as it was in the past, to someone who is one of those two choices under the NMA. So we're doing it the same. So it's either the same or different, depending on how you define what it is you're looking at in the past. Well, I see my time has expired. I would say in the past it was assigned in part pursuant to the rigging agreement, but that agreement didn't take away the work from the iron workers. It simply provided either the work belonged to the iron workers or it belonged to a composite crew. And our position is, based on the statutory language, that what happens in the future is divorced from the statutory inquiry that Congress imposed by the requirement that the court is supposed to look at and the trustees, the arbitrator, and the court is supposed to look at what was previously required. But that precludes us from looking at this assignment provision in the NMA. I believe so, Your Honor. The NMA says that assignment provision is how we determine jurisdiction. Those are all agreements that happened after Stevens terminated the contract. So whatever happens in the future, the only question is, was that work that was previously within the iron workers' jurisdiction and was work on which Stevens was previously required to pay contributions? Thank you.  May it please the Court. Your Honor, I'm Dan Richards on behalf of Stevens Employers and Constructors. Appellee in this case, Stevens is a construction company that's been assigning work to unions since 1970, and it did so on the No. 4 Seamless at issue. Arbitrator Sands, an arbitrator with more than 4,000 labor and withdrawal liability disputes under his belt, correctly found that Stevens proved by a preponderance of the evidence that the trustees' withdrawal liability assessment was both unreasonable and clearly erroneous. That was the issue he was charged to decide under 1401A3A. And he found that because the fund assessed liability for work which is not in the iron workers' jurisdiction and was not of the type for which contributions to the fund were ever required, that the fund was wrong, the trustees were wrong and unreasonable when they assessed liability in this case. The crux of this discussion really is the withdrawal liability provisions, the construction exemption, 1383B2B. The statutory language is really what we're talking about here, and the fund is ignoring the plan language of the statute. The statute requires that withdrawal only occurs if an employer that ceases to have an obligation to contribute under the plan resumes work in the jurisdiction of the CBA, of the CBA it says, right in the statute, of the type for which contributions were previously required. So of the type, I mean, so that could be the way it's assigned under the NMA, you know, in terms of whether it's given to millwrights or iron workers, but you could also just ask yourself, what kind of work is this? And I'm not really going to get caught up in what label you put on whether someone's a millwright or an iron worker. This is a similar type of work, and since we're really focused on withdrawal liability and an underfunded fund, that's all that matters. We're not going to get caught up in the labels because the labels are dangerous. They allow manipulation. The labels may be dangerous, Your Honor, but the statute specifically requires that the work be within the jurisdiction of the CBA. But it says type, and of the type. So the type can be just describe the work. And wouldn't you agree this is work that you could have millwrights doing one day and iron workers doing another? I'd agree that this was work that millwrights were doing all during this period of time as well as iron workers. Right. Both were. Sure. But was it the type for which contributions were required? No, it wasn't. Because that takes you to labels and labels. I mean, I don't mean to be disparaging of the word labels, but I'm just saying that's how it ultimately works. Well, I'd say this, that Congress enacted this legislation and said the type for which contributions were previously required. Stevens did millwright rigging work, and Stevens did iron work rigging work. And the testimony heard by Arbitrator Sands was they'd do it based upon what were the needs of the job. And once it was established that 71 was no longer a handcuff on anyone, they were free to assign it for efficiency. And they testified at the hearing they assigned it for efficiency in this case because the millwrights were working on machinery with close specs. And it made sense for them to do the rigging. They were going to be working on that machinery. That was millwright rigging. It was assigned under the NMA as millwright rigging at the pre-job assignment. Stevens never in its history has been required to make a contribution to the iron workers pension fund for millwright rigging work. And it doesn't make sense to read the statute that way, Your Honor. And the reason it doesn't is because it leads to a tortured interpretation where any time someone picks up a wrench because there's overlapping jurisdiction, a fund that's going to try to assess liability can say, oh, you picked up a wrench. We have overlapping claims of jurisdiction on that. The reality of the NMA and the reality of this whole area is that the die was cast in this case when the union chose not to seek a referee and recharacterized this as something that had to be done by iron workers. No. The die was cast when the work was assigned. The work was assigned. Well, let's look at the statute. Wouldn't it have changed things if they had protested and the referee had said iron workers? Then you would have satisfied this. I think if they would have taken it to a conclusion and a referee said that this was iron worker work, then I think that that would have been work within the jurisdiction of the iron workers. But it wasn't. That didn't happen. Judge Sutton is asking, would that have changed the result? You said no, but now you're saying yes. If they had taken it to an umpire and the umpire determined it was iron worker work? Yes. No, I'm saying that it may have changed the result because then they would have been doing iron work within the jurisdiction of the CBA. It's not the end of the world concession. No, I know. It would have changed the outcomes. That's why I said the die was cast when that happened. What I'm saying is I think that you're right, but this waiver argument isn't really a waiver because I don't think I used the word waiver for furfiture or anything remote. I know you didn't, Your Honor. I'm talking about in the funds briefs they've argued waiver, waiver, waiver. I understood your opposing counsel to suggest, and maybe he didn't, that when some of this power rigging work was done by iron workers before, you agree that sometimes that happened beforehand. Yes. At that time the NMA was not in effect. Is that true? No. Okay. No, the thing was that the 7- NMA, there's been an NMA all through all of this. Is that true? I think on NMA jobs, yes. But one of the things that was heavily disputed in the case was there was also something called the 1971 rigging agreement. And let me back this up to the statute because it gives you a clear roadmap on how to do this. The statute says that the work has to be resumed in the jurisdiction of the CBA. Well, how do you figure out what that means? You have to look to the CBA. The CBA of the iron workers specifically defines jurisdiction as craft jurisdiction number one, Roman numeral number one in the CBA, and it says that it's subject to trade agreements and agreements national in scope. The 71 rigging agreement for a period of time was one of those agreements and it for a period of time defined jurisdiction. And Tim McCarthy, who's the chairman of the fund and was also the head of the iron workers, asserted in his November 1st letter when he was claiming the initial dispute, hey, you're doing work in the trade jurisdiction of the iron workers. And he cited the 71 rigging agreement. The problem with that is he knew it had already been abrogated. He knew that at the time that he presented to his colleagues on the fund, but he never shared that with them. He never shared with them that Stevens had assigned this work to union mill rights under the NMA, that the work stood as assigned. None of that was shared with the fund. Arbitrator Sands sat through several days or four days of testimony on this, and he got that. He understood what was really going on here. He referred to it as a cat's paw, or I think it was referred to as a bait and switch earlier today. So the testimony showed that there was no work ever done within the iron workers' jurisdiction. And it's a simple interpretation of the statute. If it says resumes work in the jurisdiction of the CBA, you have to look at the CBA. The CBA specifically defines the jurisdiction as craft and territory. The legislature could have said territorial jurisdiction. It didn't. It could have said craft jurisdiction. It didn't. It said jurisdiction. And that recognized it has to be both within the territory and within the jurisdiction of the union. And this work was never there because it was assigned under the NMA initially from the start to the mill rights. So this isn't a waiver argument. There was never work subject to a contribution in the first place. The iron workers had the ability to challenge that through the process, and they did for a while, and then they abandoned it. But the real important point here is it was assigned to mill rights, so it was never iron worker work. And so the statute says was it within the jurisdiction, and it also says of the type for which contributions were previously required. I'd suggest that what makes a sensible reading of that is it's asking, okay, right here and now, are you doing work that's within the jurisdiction of the CBA? And it also recognizes that jurisdictions of the CBA can shrink and they can grow. And so it also says, and was it the type for which contributions were previously required? Because if an employer is no longer signatory, a CBA can increase its jurisdiction or shrink it. The question is not just are you doing the work within the jurisdiction, but was it the type for which contributions were previously required? They were never required to give contributions for mill rigging work. Under the NMA, the work is as assigned. It stands as assigned from the beginning. Standard of review, there was a dispute in the briefs over standard of review. I would suggest that the court look to its Sherwin-Williams decision, which notes that these type of withdrawal liability claims are mandatory, reviewed by an arbitrator, and give great deference to the findings of the arbitrator. Arbitrator Sands has had an eminent career reviewing withdrawal liability cases. Do you agree we have to review the legal determinations de novo? Yes, Your Honor. No question about that. I think interpreting the law is de novo. But in order to interpret this case, you have to look at the plain language of the statute and arbitrator Sands and the district court recognize, then you have to go through a factual analysis of what happened. You have to look at the CBA. You have to look at what work was assigned. You have to look at what was done. You have to look at what the panel, the trustees, actually based their decision on. And arbitrator Sands found that they based their decision on the work assignments at the pre-job. The assignment of rigging work to mill rights was the basis of the fund's decision. I'd submit that that's subject to a clearly erroneous standard. He looked at some of the testimony that's raised in the briefs but wasn't discussed here about other work performed on that job. And he said that it wasn't relevant to the analysis because he found it wasn't part of the fund's determination. If you're going to look at it, though, I would submit that the record supports and the evidence submitted showed that none of that was really work that triggered withdrawal liability either. There were two points raised before the pre-job conference where laborers were drilling holes for rebar. The record showed that that was assignable work to laborers and it was properly done by laborers. There was some unloading of machinery by mill rights to avoid demerit charges for trucks sitting around idle. That was properly assigned under the NMA. There were two situations where Stevens found out that a couple of mill rights had done work on the job. What are the facts that he found that are subject to clearly erroneous review? Because every time I hear you talk about a fact it's usually connected to an agreement and an agreement usually is in writing and we can construe the agreement to say what it says or doesn't say what it doesn't say. I think one of the facts was what was the fund's basis for determining to assess withdrawal liability and it was based solely on the pre-job conference. So that all this other work raised in the briefs is irrelevant. I think that was a clearly erroneous standard determination because he weighed the evidence and said, you know what, that's not what they based their decision on. He looked at the May letter from the fund back to Stevens that actually said, hey, by the way, you said that the alleged abrogation of the 71 rigging agreement gets you off the hook. Well, it still applies here in northeast Ohio despite their testimony at hearing that they knew it no longer applied. So he recognized that it was based on the assignments of work in November when he made his determination. So I would submit that's a clearly erroneous determination. His findings regarding the applicability or not of the 71 rigging agreement were the subject of intense discussion during the hearings. And the head of the millwrights came in and said, hey, wait a minute, I was at the meeting where this was abrogated. And it was abrogated for a lot of good reasons. To avoid the situation where we're handcuffed and we can't do work in an efficient way. It no longer applies. And Tim McCarthy, the chairman of the fund, testified when he was in the hearing on cross-examination. Yeah, I was aware at the time that I presented this that it would have been abrogated. Yet they still adhered to it. So that was wrong. And I would say that would be something that would be subject to a clearly erroneous determination. I would point out that some of the other work raised was outside the scope of what Stevens ever directed or authorized millwrights to do. And under the Figueroa case cited in the briefs, the arbitrator and the district court said that that was work beyond the scope of what Stevens ever employed millwrights to do. It hasn't been discussed here this morning, but it is raised in the briefs, so I briefly mention it. It was a three-by-four foot piece of rebar that millwrights were down in a hole waiting to pour a foundation. They realized that the vendor, the ironworker subcontractor, hadn't put it in. They had a concrete truck coming, so they threw in a three-by-four foot piece of rebar. When Stevens found out about it, they said, look, that work is assigned to ironworkers. Ironworkers are to perform it. They were actually trying to protect the assignments to the ironworker subs. And as soon as they found out about it, they said, that's not something you're supposed to be doing. I would submit, though, since they were doing it with a concrete truck coming, the NMA envisioned situations where for safety and efficiency and to avoid job delays, you can do an assignment to avoid those problems, and that it was still properly assigned. But it was really not relevant because it was done without their knowledge or direction, as was some work done on a handrail and grading for the charge-discharge machine that was the subject of some discussion in the briefs. None of these were the subject or basis of the fund's assessments. They were mentioned in the briefs, but those were all done. As soon as Stevens found out that any work was being done, they said, that's not millwright work. That work was assigned to ironworkers. Ironworkers need to do it. There was one situation on a Sunday. There was some testimony in the record. It was raised in the brief where Stevens had – millwrights put a checker plate cover over some hydraulic piping on a Sunday. Hydraulic piping, the millwrights were flushing the piping. It was described in the record by Harry Mertz at pages 281 to 292 of the record that there was a problem because the hydraulic flushing was finished before anybody thought it was going to get done. They were in an outage. They had U.S. steelworkers coming in to work on this machinery, and it was unsafe to work on until they put this plate over, this checker plate cover so that they could stand on it and not get injured, and so that they could continue the work. So he said, it was a Sunday. I had U.S. steel wanting to get the plant back operational, and so I had the millwrights put a checker plate over the piping because it was a rat's nest. I did that for safety reasons, for efficiency, and to avoid delays in the job. The NMA, the very first page, recognizes safety, efficiency, and avoiding delays in the work as proper reasons to have someone do something. So I would also submit that while arbitrator Sands clearly found that that wasn't the basis for the assessment of withdrawal liability, that if the court were to look at it, that that was work that was also properly done by millwrights under that particular situation and is not a trigger of withdrawal liability. Why wouldn't we remand instead of figuring all that out ourselves? I don't think you need to. It was looked at. It was reviewed by arbitrator Sands. He heard testimony on it. Say what you just said, though. What he said was that I find that the basis of the fund's assessment was solely the assignments of the rigging work. So I'd say that was a finding of fact that's subject to clearly erroneous standard of review and that you need not go back through it because he's already heard testimony on it and didn't feel that it triggered withdrawal liability. In closing, I'd just like to say... Well, he said it wasn't properly before. It was never raised before or discussed in detail, at least. That's wrong, right, to rely on the fact that it wasn't raised before? I'm not... The arbitrator didn't make the argument that you're making. You're saying, well, he must have because he made the final conclusion, right? And I'm saying, well, why can't we assume that instead he relied on the fact that this was not something that was part of the original claim that was brought by the fund? Well, we know it wasn't part of the claim brought by the fund because none of it was done in November when the fund assessed liability. Right, but I got the impression that that was his fallacious basis for not reaching it rather than the argument that you're making. Well... Such that maybe remand might be appropriate. I don't know that I... That's my question. I'm not saying that's the answer. That's my question. You're not really answering that question. I understand what you're saying, Your Honor. I would say remand is not appropriate because there was already testimony given. Credibility of the witnesses who talked about this was weighed. And it was determined that, first of all... Well, it wouldn't have been weighed if the reason that the arbitrator didn't address it is that he didn't think it was properly before him. Well, I think he thought it was not part of what the fund's basis of their decision was. And I would say that if he made that finding a fact, that he had the discretion to do that after hearing the testimony of the various witnesses to see what was the basis of the fund's decision. And he found it was clearly erroneous and unreasonable based upon what they decided in it. So I don't know that you need a remand to flush that out again. I understand your point. And I guess my last comment I wanted to make is... Your red lights have been on for a while. I just want... I want to wrap up there. Absolutely, Judge Clay. All I wanted to say was that the purposes of the MPAA are really what's at issue here. The one goal that it was designed for was to protect the pension funds. The pension fund was protected here. The iron workers received over 9,000 hours of contributions in this case. And the work that Stevens assigned to millwrights was properly assigned to millwrights and went to millwrights pension fund. This is not a case where Stevens was bringing in non-union employees to do iron worker work. That did not happen. I'd submit that the decisions of the arbitrator and the district court were correct and that this court should affirm. Thank you very much. Any rebuttal? Your Honor, we agreed that a remand might be appropriate in this case to consider the evidence that was presented to the arbitrator relating to work, iron worker work performed by Stevens' employees that was not available to the trustees at the time they made their assessment. This evidence where it was admitted that Stevens' employees performed iron worker work was discovered during the course of pre-arbitration discovery. The work occurred prior to the pre-job conference where Stevens indicated how it was assigning the work and the union and fund never had access to that information until the arbitration. In concrete pipe, the court held that the arbitrator may hear new evidence during his review and the law is that the assessment may be confirmed on any basis apparent in the record. The evidence was presented to the arbitrator, he made no mention of it, and the district court concluded that the district court as well would not make any judgment as to the relevance or credibility of that information simply because it was not before the trustees at the time they made the assessment. In my initial remarks, I didn't mean to suggest that the NMA wasn't in effect prior to Stevens' termination of the collective bargaining agreement, but my point was that agreements that Stevens enters into as to how it's going to do work in the future after it terminates its agreement with Local 17 simply aren't relevant based on our view of the congressional test. The arbitrator held that because the work was assigned to millwrights, it was millwrights' work. The district court recognized the circularity of this argument. To allow an employer to control what work triggers withdrawal liability simply based on assignment would allow all employers to basically avoid withdrawal liability. Our position is that the fund is not subject to defenses based on union conduct. Precedent from this court and the Supreme Court hold that fund trustees are not bound by union conduct, and we've cited Lewis v. Benedict Cole and Schneider v. Robbins in our brief. I'd also mention briefly that we made an argument that the arbitrator exceeded his authority, as did the district court, in finding that there was an exception for de minimis work. The arbitrator admitted that Stevens had performed iron worker work, but found that the work did not trigger withdrawal liability because it was de minimis. Whether such an exception exists is for this court to determine on its own de novo, and Congress has already considered that issue in determining that certain work, certain withdrawal liability less than $50,000 may be de minimis. It's undisputed that the work in issue was done by Stevens' employees. Stevens controlled the job site. Stevens' management approved the timesheets paying the employees to do the iron worker work, and Stevens' project manager, Harry Mertz, admitted that he was wrong and that Stevens' millwrights should not have performed the iron worker work. It's long been the rule in this circuit that defenses based on ignorance and lack of authorization do not apply to fund claims under the NMA. To put this case in context, someone is going to pay. Stevens' position is that other employers or taxpayers should fund the pensions of Stevens' former employees. Congress, through enactment of the Withdrawal Liability Statute, chose withdrawing employers as the entities who are required to fund the pensions of their employees and former employees. If the court, as the district court, creates judicial exceptions to statutory liability, the cost of funding pensions will fall on other employers. But that's the nature of the exception that Congress created, isn't it? The construction industry exception. Is it the case that you don't have to pay if you get out of the business? If you get out of the business for five years, correct. Once you resume work in the jurisdiction within that five years. The criticism that you're making is a criticism that would apply even to situations where they validly complied with the statute. You've still got a company that's getting out of the business and not having to pay for it for the previous. We're talking about money for previously accumulated that they're behind, right? Correct. That's what the real issue is here. We're not concerned about how much these particular people are getting paid so much as whether this triggers Stevens' requirement that they contribute to the deficit prior to when they left. Is that correct? That's correct, Your Honor, but the point is. That's going to happen whenever Stevens complies with the statute. He's going to get out of having to pay for part of that backfall or shortfall. But Congress provided if you work in the jurisdiction within five years. Right, subject to the exceptions. So you argue about the exceptions, but you say if we. . . It doesn't make sense to rely on a policy of full funding when the statute is creating exception to full funding, basically. I understand, Your Honor. This is the scheme that Congress came up with. The scheme they came up with. I mean, maybe it doesn't make sense, but we just have to follow it the way it's written. I'm just balking a little bit at the idea that we have to look at some sort of perceived fallacy in the very fact that Congress has created this exception. We've just got to apply this exception the way they created it. Correct, Your Honor. Whether it makes sense or not, right? Right, and our view is if the court applies the law that the judgment of the district court should be reversed. Thank you. Thank you. The case is submitted.